Opinion issued August 23, 2018



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00092-CV

————————————

**KARL J. LYONS, Appellant**

**V.**

**TERRY DAVID ORTEGO AND DONNA HALL ORTEGO, INDIVIDUALLY AND D/B/A D&D SUPPLY, Appellee**

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-31125**

---

## MEMORANDUM OPINION

Karl Lyons appeals the trial court's judgment awarding Terry and Donna Ortego specific performance of the parties' contract for the sale of real property. Lyons argues that the contract terminated by its own terms, so it cannot support an award of specific performance. To the extent he breached the contract before it

terminated, he contends that the Ortegos were required to prove their tender of performance to be entitled to specific performance. Consequently, he seeks reversal of the judgment compelling his specific performance of the contract, including the trial court's award to the Ortegos of attorney's fees, court costs, and other litigation expenses.

Because the contract terminated by its unambiguous terms without a written extension, and because the Ortegos were not excused from proving their tender of performance, we reverse. We render judgment that the Ortegos' earnest money be returned to them and that they otherwise take nothing by their claims.

## Background

The parties' dispute centers on their contract for the sale of commercial real property in northern Harris County. The property was rented and occupied by appellees Terry and Donna Ortego. A business operated out of a building on the property, selling water pipes and related equipment. In early 2013, appellant Karl Lyons informed the Ortegos that he was the new owner of the property, and they agreed to a lease. The lease included an option for the Ortegos to buy the property.

The parties subsequently executed a sales contract for the property, and the Ortegos paid $1,500 in earnest money. The contract stated that it "terminates on October 15, 2013," and, separately, that "the closing must occur on or before October 15, 2013." It also provided that "[t]ime is of the essence." If Lyons failed

2

to comply for any reason, the contract provided that the Ortegos "may terminate this contract and receive the Earnest Money or sue for specific performance." It contained two integration clauses, both of which provided that the contract "cannot be changed except by [the parties'] written consent."

The contract's paragraph 9(A) set forth a procedure for curing title problems and extending the "Closing Date," if necessary, while Lyons worked to cure title problems. The contract defined "Closing Date" as follows: "The closing of the sale (the 'Closing Date') shall take place at Darden, Fowler, & Creighton, L.L.P. if and when Buyer exercises the option contained in the Commercial Lease of even date herewith. The closing must occur on or before October 15, 2013."

A commitment for title insurance prepared by an insurer for Lyons's counsel revealed several title problems that needed to be cured before the insurer would issue a title-insurance policy. The parties dispute what efforts, if any, Lyons or his representatives undertook to cure the title problems from September 30, when his attorney received the commitment, to October 15, the date fixed by the contract for its termination and for the Closing Date. October 15 passed without any written amendment changing the termination date.

In April 2014, Lyons became "frustrated" that the transaction and efforts to cure title were "hassles." In a letter, he advised the Ortegos that the contract terminated on October 15, 2013; that he understood that they were unwilling to

waive the title problems; and that he was ending any further discussions with them about the sale. Despite the ultimate resolution of the title problems that summer, Lyons refused to complete the sale.

The Ortegos sued, seeking specific performance of the contract and damages. They maintain that they were always ready, willing, and able to pay the contract's purchase price. Lyons stipulated that, if their claim for specific performance were to be denied, he would refund their earnest money.

The lawsuit proceeded to trial before a jury. The jury returned answers mostly favorable to the Ortegos. It found that the parties agreed to extend the contract beyond its termination either in the contract itself or by the conduct of Lyons or his agents. It found that Lyons failed to comply with the contract and that the Ortegos did not "fail to comply." It found that the parties should have closed the sale by August 30, 2014, and that the Ortegos were ready, willing, and able to perform on that date. But the jury awarded no money damages.

Lyons opposed entry of judgment in the Ortegos' favor, contending in part that the contract's integration clauses prevented any unwritten amendment from extending the contract beyond its termination date.

Based in part on the jury's answers, the trial court entered a judgment awarding the Ortegos specific performance of the contract, attorney's fees, court costs, and other litigation expenses. The court conditioned Lyons's

4

specific-performance obligation on the Ortegos paying the $435,000 purchase price, less the earnest money and the sums for attorney's fees, court costs, and other litigation expenses that the court awarded.

Lyons moved for a new trial, again arguing that the contract terminated on October 15, 2013, and that it therefore could not be specifically enforced. The trial court denied the motion. This appeal followed.

## Analysis

### I.      Interpretation of sales contract

In his first issue, Lyons contends that the contract terminated on its termination date of October 15, 2013, and that it was not extended by any other provision in the contract or by the parties' conduct.

Specific performance is an equitable remedy for breach of contract. *Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). The elements of a contract claim are (1) the existence of a valid contract, (2) the plaintiff's performance or tendered performance, (3) the defendant's breach, and (4) the plaintiff's damages sustained as a result of the breach. *Id.* Therefore, to be entitled to specific performance, a party must show that the contract is valid and enforceable. *See Antwine v. Reed*, 199 S.W.2d 482, 485 (Tex. 1947); *Nguyen v. Woodley*, 273 S.W.3d 891, 898 (Tex. App.—Houston [14th Dist.] 2008, no pet.). When a contract for the sale of real property terminates by its own terms, it no

5

longer may be specifically enforced. *See Cate v. Woods*, 299 S.W.3d 149, 153 (Tex. App.—Texarkana 2009, no pet.); *Nguyen*, 273 S.W.3d at 898.

Interpreting unambiguous contract language is a question of law, reviewed de novo. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015). "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Id.* at 450 (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). Generally, we interpret a written contract according to what is expressed in the contract's language and not according to extra-contractual expressions of intent. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018); *Anglo-Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011).

A court must examine and consider the entire writing and harmonize and give effect to all provisions of the contract so that none are rendered meaningless. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). A court must not "make new contracts between the parties and must enforce the contract as written." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (orig. proceeding).

Contract language should be given its plain, ordinary, and generally accepted meaning, unless the writing directs otherwise or unless the contract itself shows that the language to be interpreted is being used in a technical or different sense. *See URI*, 543 S.W.3d at 764; *Moayedi*, 438 S.W.3d at 7.

Lyons relies on the contract's termination language in paragraph 3: "This Contract terminates on October 15, 2013." He contends that this termination date was never extended. If not extended by some means, then this unambiguous language requires us to conclude that the contract terminated on October 15, 2013. The Ortegos respond by offering two arguments to support the contract's continuation past the termination date, based upon paragraph 9(A) concerning the "Closing Date" and the parties' conduct.

## A. "Closing Date" provision

The contract defined "Closing Date" in paragraph 7: "The closing of the sale (the 'Closing Date') shall take place at Darden, Fowler, & Creighton, L.L.P. if and when Buyer exercises the option contained in the Commercial Lease of even date herewith. The closing must occur on or before October 15, 2013." The Ortegos rely on paragraph 9(A)'s provision for extending the Closing Date to justify extension of the contract's termination date. The relevant language provided:

> Buyer shall deliver, or cause to be delivered, to Seller within thirty (30) days from the date of this Contract a Commitment for Title Insurance (the "Commitment"). If Buyer has an objection to items disclosed in such Commitment provided for herein, Buyer shall have twenty (20) days after receipt of each such instrument to make written objections to Seller. If Buyer makes such objections or if the objections are disclosed in Commitment or by the issuer of the Title Policy, Seller shall have twenty (20) days from the date such objections are disclosed to cure the same, *and the Closing Date shall be extended, if necessary*. Seller agrees to utilize its best efforts and reasonable diligence to cure such objection, if any. If the objections are not satisfied within such time period, Buyer may (i) terminate this

7

Contract and the Earnest Money shall be refunded to Buyer, or (ii) elect to waive the unsatisfied objections and complete the purchase

(Emphasis supplied.)

Under this contract, the termination date and the Closing Date were distinct concepts identified by distinct language. The contract's anticipation of the possibility of the Closing Date being extended beyond the initially stated deadline ("on or before October 15, 2013") is not inconsistent with the separate provision that provided for termination by a date certain. The contract specified that time was "of the essence." The contract included integration clauses, which required that amendments be in writing. Even after the termination date passed, the parties were free to negotiate toward completing the sale. If they intended to remain bound by the contract, they could have confirmed that in writing.

We must enforce the parties' contract as it was written. *See Davenport*, 522 S.W.3d at 457. As it was written, it unambiguously terminated on October 15, 2013. To hold otherwise in the absence of any written amendment would render the termination provision meaningless. *See Moayedi*, 438 S.W.3d at 7.

The Ortegos rely on *SHA, LLC v. Northwest Texas Healthcare System, Inc.*, No. 07-13-00320-CV, 2014 WL 31420 (Tex. App.—Amarillo Jan. 3, 2014, no pet.) (mem. op.), for the proposition that contract language may "implicitly" extend an express termination date. In *SHA*, a hospital company and insurer entered into

8

two amendments to their reimbursement contract, which provided, respectively, that "[t]his Agreement shall continue for a term of three (3) years and may not be terminated by either party except for cause" and that "[b]oth Hospital and FirstCare agree that this Agreement shall not be terminated by either party without cause prior to August 31, 2012." 2014 WL 31420, at *2. The court said that the two amendments helped the parties "to extend their business relationship" by "mentioning another three years either explicitly as in the First Amendment, or implicitly as in the Second Amendment." *Id.* at *3. Both explicitly referred to termination of the contract and circumstances which did not justify termination.

By contrast, the extension of the Closing Date referenced in paragraph 9(A) did not expressly address the contract's separate provision of a fixed termination date. Paragraph 9(A) addressed circumstances that could lead to the extension of the Closing Date, which initially was designated to occur "on or before October 15, 2013," yet did not purport to override the contract's distinct provision of an October 15, 2013 termination date. We conclude that *SHA* is distinguishable and that paragraph 9(A)'s closing provisions did not nullify paragraph 3's termination date.

## B. Extension of contract by conduct of parties

The Ortegos argue that the termination date of the sales contract was modified by the conduct of the parties, who worked toward completing the

9

transaction even after the October 15, 2013 termination date. Lyons contends that the statute of frauds and the sales contract's integration clauses barred the parties from amending the contract's termination date except by a written amendment. *See, e.g.*, *Robertson v. Melton*, 115 S.W.2d 624, 627 (Tex. 1938) ("To permit the oral modification is forbidden both by the statute of frauds and by the express agreement of the parties."); *Colvin v. Rickert*, No. 04-05-00165-CV, 2006 WL 285993, at *7–8 (Tex. App.—San Antonio Feb. 8, 2006, pet. denied) (mem. op.) (holding that contract for sale of real estate terminated by date certain expressed in contract without any written extension amendment). Paragraph 13(E) provided: "This Contract constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter and cannot be changed except by their written consent." Similarly, paragraph 25 stated: "This contract contains the entire agreement of the parties and cannot be changed except by their written consent."

The Ortegos contend that Lyons may not rely on the contract's integration clauses to contend that the parties' conduct did not extend the termination date. They assert that "an integration clause, like any other term, can be modified orally by the conduct of the parties."

The only authority the Ortegos rely upon for their argument is *Shafer v. Gulliver*, No. 14-09-00646-CV, 2010 WL 4545164 (Tex. App.—Houston [14th

Dist.] Nov. 12, 2010, no pet.) (mem. op.). In *Shafer*, the court noted "an exception to the general rule against oral modification of contracts covered by the statute of frauds": certain oral agreements may "extend the time of performance, so long as the oral agreement is made before the expiration of the written agreement." *See Shafer*, 2010 WL 4545164, at *7. The *Shafer* court also held that a contract for the sale of real estate whose closing was expressly set for either a date certain "or within 7 days after objections to matters disclosed in the Commitment or by the survey have been cured, whichever date is later," could close after the date certain because the seller was not able to provide clear title by the date certain. *See id.* *Shafer* is distinguishable because it involved only the statute of frauds and not, as here, an express contractual provision that required any amendment to be in writing. The contract at issue in *Shafer* also did not include an express termination date separate from the provisions that set the closing date.

Finally, the Ortegos contend, without citation to authority, that Lyons should have pleaded and secured jury findings on the integration clauses because their application is an affirmative defense. This misplaces the burden of proof: as the plaintiffs seeking to specially enforce a contract for the sale of real property, the Ortegos bore the burden of proving the enforceability of a contract. *See Antwine*, 199 S.W.2d at 485; *Cate*, 299 S.W.3d at 153; *Luccia*, 274 S.W.3d at 146; *Nguyen*, 273 S.W.3d at 898; *see also Bell v. Phillips*, No. 14-00-01189-CV, 2002 WL

11

576036, at *7 (Tex. App.—Houston [14th Dist.] Apr. 18, 2002, no pet.) (not designated for publication) (noting and applying rule that party claiming contract modification bears burden of proof on modification).

We therefore hold that the contract's integration clauses barred any amendment to the contract's termination date that was not in writing. As such, we need not separately address whether the argument that the contract was extended by the parties' continued negotiation was foreclosed by the statute of frauds. TEX. R. APP. P. 47.1. The Ortegos did not identify any writing that extended the termination date, and because paragraph 9(A) did not extend the termination date, the contract was not extended beyond October 15, 2013. Accordingly, any post-termination conduct by the parties cannot support an award of specific performance of the terminated contract. *See Cate*, 299 S.W.3d at 153; *Nguyen*, 273 S.W.3d at 898. We sustain Lyons's first issue.

## II.  Specific performance

Our interpretation of the contract is not dispositive of the appeal, because the jury found that Lyons breached the contract. In his third issue, Lyons contends that specific performance was not justified because the Ortegos did not adduce sufficient evidence of their tender of performance.

The Ortegos respond that they were not required to actually pay the purchase price to Lyons to seek specific performance. Instead, they contend they were only

required to obtain a jury finding that they were ready, willing, and able to perform. They argue that they were excused from tendering performance because Lyons refused to close, according to his April 2014 letter; because he ended all discussions about a sale in the same letter; and because the contract did not require them to pay the purchase price until the Closing Date, which never occurred.

Generally, plaintiffs seeking specific performance must prove both that they tendered performance and that they were ready, willing, and able to perform. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593–94, 599–600 (Tex. 2008). "These two requirements are not the same thing." *Id.* at 599.

The tender requirement may be excused in certain cases. It is excused "when a defendant refuses to perform or repudiates a contract . . . ." *Id.* at 594. It is also excused when the defendant has committed a breach that makes the plaintiff's tender a "useless act, an idle ceremony, or wholly nugatory." *See id.* (quoting *Wilson v. Klein*, 715 S.W.2d 814, 822 (Tex. App.—Austin 1986, writ ref'd n.r.e.)); *Mustang Amusements, Inc. v. Sinclair*, No. 10-07-00362-CV, 2009 WL 3487796, at *5 (Tex. App.—Waco Oct. 28, 2009, no pet.) (mem. op.) (applying *DiGiuseppe*'s "useless act" rule and holding that trial court did not abuse its discretion by "determining that [real-estate purchaser's] actual tender would have been 'a useless act' and therefore, was excused").

13

"Where time is of the essence of a contract, a party must perform or tender performance in strict compliance with the provisions of the contract within the time prescribed, in order to entitle him to specific performance." *Liedeker v. Grossman*, 206 S.W.2d 232, 234–35 (Tex. 1947). When time is of the essence in a contract for the sale of real estate, "the buyer must make an actual tender of the price and demand of the deed *within the time allowed by the contract.*" *Wilson*, 715 S.W.2d at 822 (internal quotation omitted; emphasis in original); *accord Mustang Amusements*, 2009 WL 3487796, at *6; *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 572 (Tex. App.—Fort Worth 2008, pet. denied).

The Ortegos do not contend that they tendered their performance. Instead, they contend that Lyons's April 2014 letter demonstrated that it would have been "futile to require the Ortegos to tender performance." That letter said that the contract terminated in October 2013, and it ended the parties' discussions about a sale. The Ortegos thus rely on only post-contract-termination conduct for their contention that a tender was excused. But the law requires a tender "within the time allowed by the contract." *Wilson*, 715 S.W.2d at 822; *accord Liedeker*, 206 S.W.2d at 234–35; *Mustang Amusements*, 2009 WL 3487796, at *6; *Paciwest*, 266 S.W.3d at 572. The Ortegos never tendered the purchase price nor demanded that Lyons produce the deed on or before October 15, 2013. *See Wilson*, 715 S.W.2d at 822. Had the Ortegos undertaken some affirmative act to tender performance

14

before the contract terminated, it may have triggered Lyons into action. *See, e.g.*, *id.* at 821 ("[T]he *purpose* of a tender is two-fold: (1) a valid tender of the purchase price invokes the seller's obligation to convey and places him in default if he fails to do so; and (2) the tender satisfies the fundamental prerequisite of specific performance—that the buyer show that he has done or offered to do, or is then ready and willing to do, all the essential and material acts which the contract requires of him." (emphasis in original)); *accord Paciwest*, 266 S.W.3d at 572.

The Ortegos also contend that the jury's findings on breach and on their readiness, willingness, and ability to perform support an award of specific performance. The Ortegos rely on the jury's answers to questions five and six:

QUESTION No. 5

By what date, if any, do you find that the parties should have closed on the transaction at issue in the Agreement?

Answer with a month, day, and year, if any: 8·30·14

QUESTION No. 6

Do you find that the Ortegos were ready, willing, and able to perform on the date found by you in Question no. 5?

Answer "Yes" or "No"

Answer: Yes

This contention fails for two reasons. First, proof of tender and proof of readiness, willingness, and ability to perform "are not the same thing." *See DiGiuseppe*, 269 S.W.3d at 599. Second, the Ortegos' readiness, willingness, and

15

ability to perform on August 30, 2014, was irrelevant because "[t]he plaintiff's burden of proving readiness, willingness and ability is a continuing one that extends to all times relevant to the contract and thereafter." *Id.* at 594 (quoting 25 Richard A. Lord, *Williston on Contracts* § 67:15 (4th ed. 2002)). The finding of readiness, willingness, and ability to perform in August 2014 does not support the conclusion that the Ortegos were ready, willing, and able to perform on October 15, 2013, or that they tendered performance by that date.

The Ortegos also contend that they are not required to have tendered their performance because the contract required them to pay the purchase price only by the Closing Date, and no closing ever happened. This contention, however, does not account for the contract's termination on October 15, 2013. When a contract for the sale of real property terminates by its own terms, it may no longer be specifically enforced. *See Cate*, 299 S.W.3d at 153; *Nguyen*, 273 S.W.3d at 898.

The Supreme Court of Texas rejected a similar argument in *DiGiuseppe*. DiGiuseppe failed to secure a finding that he was at all times ready, willing, and able to perform. *Id.* at 596–97, 603–04. But he contended that the contract excused him from proving readiness, willingness, and ability to perform. He pointed to the contractual language that allowed a non-defaulting party to "seek to enforce" the contract by specific performance. *Id.* at 596–97. The court rejected this argument, reasoning that the contractual language that a party may "seek to enforce" the

contract by specific performance meant merely that specific performance "is available as a remedy, but nothing in the provision suggests DiGiuseppe is relieved of his obligation to prove he is entitled to it under the law." *Id.* at 598.

Like the contract in *DiGiuseppe*, the contract provided that Lyons's failure to comply meant that the Ortegos may sue for specific performance. That the Ortegos may sue for specific performance does not mean that they are excused from proving the elements imposed by the common law for proving entitlement to the remedy. *See id.* at 596–98.

The Ortegos were not excused from proving their tender of performance. Because they did not carry their burden on tender, we sustain Lyons's third issue.

## III.    Attorney's fees and costs

Lyons contends that the award of attorney's fees, court costs, and other litigation expenses cannot stand if we reverse the trial court's judgment. The Ortegos based their claim for fees, costs, and other expenses on the two contractual provisions providing for an award to the "prevailing party" and on Civil Practice and Remedies Code Section 38.001.

For contract claimants to be entitled to attorney's fees and costs under Civil Practice and Remedies Code Section 38.001, they must prevail on the cause of action and recover damages. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). Despite finding a breach by Lyons, the jury awarded no money damages.

17

The Ortegos also were not entitled to specific performance. Therefore, the Ortegos were not entitled to attorney's fees and costs under Section 38.001. *See id.*

As for the contract's provision for an award of fees, costs, and other expenses to a "prevailing party," the contract did not define "prevailing party." Therefore we apply its ordinary meaning. *See Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011). For the Ortegos to be the prevailing parties, they must be awarded something, either monetary, equitable, or declaratory relief. *See id.* (quoting *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009)). A breach finding, without a monetary, equitable, or declaratory award, is insufficient to make the plaintiff a prevailing party. *See Intercontinental Grp. P'ship*, 295 S.W.3d at 660–61; *accord Epps*, 351 S.W.3d at 866.

Because our resolution of this appeal leaves the Ortegos without either of the awards that they sought—damages or specific performance—they are not prevailing parties. Therefore, they are not entitled to attorney's fees, court costs, or other litigation expenses under the contract. We sustain Lyons's fifth issue.

## Conclusion

The parties' contract terminated on October 15, 2013, and the Ortegos did not show their tender of performance to support an award of specific performance. We need not address Lyons's other issues. *See* TEX. R. APP. P. 47.1. We reverse and render judgment that the Ortegos take nothing by their claims, and that the earnest money be returned to them. *See* TEX. R. APP. P. 43.2(c).


Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Brown.